IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  3:13-CR-30083-DRH |
| | ) | |
| JOSE MANUEL GOYOS, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MOTION FOR ORDER**
**REGARDING RESTITUTION AND VICTIM ISSUES**

The Government respectfully moves this Court to issue an order, pursuant to 18 U.S.C. § 3663A(c)(3) and 18 U.S.C. § 3664(a) and (d), relieving the Government of its obligations both to pursue restitution for the victims of the offense and to provide restitution figures to the probation officer.  The number of identifiable victims is so large as to make restitution impracticable, and determining complex issues of fact related to the amount of each victim's losses would complicate and prolong the sentencing process to such a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process.  The Government has exercised its best efforts to accord crime victims their right of restitution in the instant case and now asks the Court to rule that no additional resources need be expended in determining the exact amount of restitution owed to each of many thousands of victims in this case.

Background

1.     On December 30, 2013, the defendant, Jose Manuel Goyos, Jr., pled guilty to a one-count indictment charging him with conspiring to commit mail and wire fraud in connection with the conduct of telemarketing, in violation of 18 U.S.C. §§ 1349 and 2326.  As part of his guilty plea, Goyos admitted the following facts:

a.   From January 26 to December 17, 2009, Goyos was the registered agent and co-owner of C&G Marketing Associates, LLC, a Florida corporation that defrauded consumers using the fictitious name, Premier Timeshare Solutions ("PTS").

b.   During that time, **GOYOS** and other PTS employees conducted a fraudulent timeshare resale scheme through the use of telemarketing.

c.   PTS telemarketers worked in an office building in West Palm Beach, Florida.   From there, they placed phone calls to timeshare owners throughout the United States, Canada, and elsewhere, falsely representing or implying that the company had found someone who wanted to buy their timeshare interest.

d.   In exchange for an advance fee that typically exceeded $1,000, the PTS telemarketers promised to handle all the details of the sale and send the victims the proceeds after closing.   Once the victims had paid the advance fee, however, usually by giving the telemarketer their credit card information, the fraudulent company simply pocketed the money.   There were no interested buyers, the closings did not occur, and the timeshares were not resold.   It was, simply put, an act of thievery.

e.   To discourage and defeat subsequent chargeback attempts, PTS sent victims written contracts to sign and return – contracts that made no mention of the promised sale and obligated the company merely to provide marketing and advertising services.   Because the original sales

2

calls were not recorded, PTS could later claim that marketing and advertising was all that had ever been promised, and that any contrary impression the victim may have formed – for instance, that there was a concrete offer for the customer's unit or some genuine interest by a qualified buyer – was simply a misunderstanding.

f.  Victims who called PTS to check on the status of their transactions were directed to customer service representatives. The defendant managed the customer service department at PTS. The role of the PTS customer service department was to perpetuate the fraud by delaying and discouraging chargebacks and complaints. To accomplish that goal, representatives would lie to victims, assuring them that despite some phony, unexpected delay, their timeshare unit was still going to be sold. Repeat callers were given a series of bogus excuses, none of which had any basis in fact. By instilling a false sense of hope, PTS aimed to delay the chargeback process beyond the time that most credit card issuers allow for disputes.

g.  During its period of operation, PTS victimized over 7,000 people spread across each of the 50 States, three United States territories, six Canadian Provinces, and the Bahamas. At least 47 victims of the scam were located within the Southern District of Illinois, representing half of the district's 38 counties. All told, the scheme took in over $14.5 million.

2.      On October 9, 2013, the Government filed a motion to designate the case a multiple-victim case under the Justice for All Act of 2004.  Doc. #15.  The Court granted the motion on October 11, finding that "the number of crime victims makes it impracticable to accord all of the crime victims all of the rights described in Section 3771(a)."  Doc. #16.  The Court accordingly authorized the Government to fulfill its obligations of notice under the Act by establishing and maintaining a website that provides information about the progress of this case.  *Id.*

3.      Because of the large number of victims in this case, the Government is asking the Court to fashion another order relating to the rights of victims – in this instance, the right of restitution – so as not to unduly complicate or prolong these proceedings.

Discussion

**A.      Mandatory Restitution under the MVRA and the SCAMS Act**

4.      The Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA"), requires that District Courts make orders of restitution in cases of mail fraud, among others.  *United States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010).  The SCAMS Act contains similar language making restitution mandatory in telemarketing cases.  *See* 18 U.S.C. § 2327.  The procedure for issuing orders of restitution is set forth in 18 U.S.C. § 3664.[1]

---

[1]  The SCAMS Act provides that "[a]n order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A."  18 U.S.C. § 2327(b)(2).  Section 3664 applies to orders of restitution "under this title," which includes Sections 3663 and 3663A.  Thus, the procedure is the same whether restitution here is governed under Sections 2327 or 3663A (or 3663).

4

5.     Calculating loss for purposes of restitution is not the same as calculating loss under the Guidelines.  While the general estimation of the aggregate loss for Guidelines purposes can utilize alternative metrics, such as gain, the MVRA requires proof of actual loss to individual victims.  *United States v. Gallant,* 537 F.3d 1202, 1247 (10th Cir. 2008).  Restitution orders are available to victims to the extent that the victims would have been entitled to recover in a civil action against the defendant.  *Dokich*, 614 F.3d at 318.  Restitution is essentially a civil remedy which was created by Congress and incorporated into the sentencing process "for reasons of economy and practicality."  *United States v. Carruth,* 418 F.3d 900, 904 (8th Cir. 2005).

6.     In complex cases with hundreds or even thousands of victims, however, the determination of restitution is often impracticable.  Accordingly, Congress provided an exception to the rule of mandatory restitution, which applies when "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).  The requirements of the MVRA take into account the necessity of "maintaining efficiency in the sentencing process" as well as recognizing the limits of "what is administratively possible and convenient."  *United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2005).  Congress intended that the calculation and award of restitution be a streamlined process.  *Id* at 136.  The Senate Report stated an intent that "the sentencing phase[s] of criminal trials do not become fora for the determination of facts and issues better suited to civil proceedings."  *Reifler*, 446 F.3d at 137 (quoting 1996 U.S.C.C.A.N. at 931).

7.     Section 3664 governs the procedure for issuance of restitution orders and recognizes that the government, the probation officer and the Court can address restitution issues only "to the extent practicable."  In Section 3664(a), describing the procedure for restitution, probation officers are required to prepare a complete accounting of the losses to each victim "*to the extent practicable*."  That section continues:

> If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

8.     The word "practicable" appears twice more in that section.  Section 3664(d)(1) states that the Government should consult with victims "to the extent practicable" and that the probation officer shall provide certain information to each victim "to the extent practicable."  Thus, practicability is built into the very structure of the procedures governing restitution.

9.     In *United States v. Petters*, No. 08-364, 2010 U.S. Dist. LEXIS 55040 (D. Minn. June 3, 2010), the court attempted to fashion individual awards of restitution in a complex investment fraud case involving 338 victims, including retirement funds, hedge funds and individual investors.  After protracted proceedings, the court found that there was an insufficient factual basis to determine individual losses and *sua sponte* held that the complexity of the fact finding and the likelihood that there would be no meaningful restitution warranted an immediate termination of the proceedings.  As the Court there noted, unlike loss under the Guidelines, restitution under the MVRA requires something much closer to an exact calculation for each victim.  "The record here simply does not suffice for the Court to make that determination for each of the identified victims."  *Id* at *2.  By then, the District Court had gone through the sentencing hearing, post-sentencing

6

briefings, and post-sentencing proceedings during which the Government apparently had insufficient evidence to establish with any degree of precision the loss amount for each of the 338 victims.[1]  The District Court made the common sense decision that "the need for restitution is limited by its probable value."  Weighing the need for restitution against the burden imposed on the court in adjudicating complex restitution issues, in light of the relatively small amount of money available for restitution, the Court *sua sponte* cancelled the latest hearing on restitution as an exercise in futility and declined to order restitution.

**B.      The Government's "Best Efforts" to Accord Victims Their Rights**

10.      The legislation that establishes crime victims' rights requires that the government use its "best efforts" to accord victims their rights, 18 U.S.C. §3771(c)(1), including the right to "full and timely restitution as provided by law" under 18 U.S.C. §3771(a)(6).

11.      "Best efforts" is not defined in the Act, but the Seventh Circuit has construed its meaning in another context.  *Bartsh v. Northwest Airlines, Inc.,* 831 F.2d 1297 (7th Cir. 1987), involved an age discrimination complaint by Northwest Airlines pilots who were forced to retire at age 60 while the company's flight engineers were allowed to work past 60.  The case was settled through a consent decree that required Northwest to use its "best efforts" to retrain the pilots as flight engineers.  But flight engineers have significantly different responsibilities on an aircraft than do pilots.  Many of the plaintiffs had difficulty with the training and did not successfully complete it. They took the position that the consent decree required Northwest to train each of them to proficiency *no matter how long it took*.  The Seventh Circuit rejected that contention.

---

[1] The government has that burden under 18 U.S.C. § 3664(e).

"Best efforts," according to the Seventh Circuit, means "an obligation to act with good faith in light of one's own capabilities." According to the Court, it implies "a degree of discretion rather than an absolute requirement." It did not require the use of unlimited resources over an unlimited period of time.

12.     Similarly, the Southern District of New York construed the phrase in a contract dispute, holding that, while it may vary depending on the factual circumstances, the phrase "best efforts" is generally interchangeable with "reasonable efforts." *Monex Financial Services Ltd. v. Nova Information Systems, Inc.*, 657 F. Supp. 2d 447, 454 (S.D.N.Y. 2009).

13.     "Best efforts" must therefore be measured by a common sense standard. The use of common sense in criminal proceedings is not foreign to the Federal Rules. Indeed, Rule 2 of the Federal Rules of Criminal Procedure provides as follows:

> These rules are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay.

**C.     Rendering a complete accounting of each victim's loss is impracticable.**

14.     Most of Premier's business records were lost or destroyed before the criminal investigation began. The Government estimates that there are approximately 7,800 victims of the scheme, based on copies of Premier contracts that were supplied to investigators by a cooperating witness. The total value of the contracts exceeds $14.5 million, but there is no reliable way to confirm that the amount shown in any given contract was actually paid to the company. Nor is it possible to discern whether and to what extent any of the victims may have received refunds, either from the company itself or by successfully reversing the charges on their credit cards. This makes calculating an appropriate restitution figure for each victim essentially impossible.

15.     The Government respectfully asks this Court to find that it is not required to bring to bear every potential resource at its disposal in order to make individualized calculations for each of the many thousands of victims in this case.  The Government is required only to make good faith, reasonable efforts to determine restitution, and the Court should find that the Government has done that here.

<u>Conclusion</u>

A complete accounting of each victim's losses is impracticable in this case.  Due to the limited records available, the Government cannot practicably compile a reliable list of each victim's losses.  The Government accordingly requests that this Court issue an order relieving the Government and the probation officer from making any further efforts to do so.

Respectfully submitted this the 26th day of February, 2014.

STEPHEN R. WIGGINTON
United States Attorney

*s/ Nathan D. Stump*
NATHAN D. STUMP
Assistant United States Attorney
9 Executive Drive
Fairview Heights, Illinois 62208
Tel: (618) 628-3700
Fax: (618) 628-3720
Email: nathan.stump@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
        vs.                      )        No.  3:13-CR-30083-DRH
                                 )
JOSE MANUEL GOYOS, JR.,          )
                                 )
        Defendant.               )

**<u>CERTIFICATE OF SERVICE</u>**

I, Nathan D. Stump, Assistant United States Attorney, hereby certify that on this the 26th day of February, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically serve a copy upon all counsel of record, including Paul Sims, Esq., counsel for the defendant.

*s/ Nathan D. Stump*
NATHAN D. STUMP
Assistant United States Attorney
9 Executive Drive
Fairview Heights, Illinois 62208
Tel: (618) 628-3700
Fax: (618) 628-3720
Email: nathan.stump@usdoj.gov